[No. 30749. Department One. June 23, 1949.]

SHARPE SIGN COMPANY, *Respondent*, v. A. R. PARRISH, *Individually and as Executor, Appellant*, W. SHEPHERD *et al., Respondents.*[1]

[1]Reported in 207 P. (2d) 758.

*Arthur F. Hoppe*, for appellant.

*Scott, Langhorne & McGavick*, for respondent Sharpe Sign Company.

JEFFERS, C. J.—This action was originally started by Sharpe Sign Company, a Washington corporation, against A. R. Parrish and Elsie M. Parrish, his wife, and W. Shepherd and wife, in the superior court for Pierce county, to recover on two promissory notes. Subsequent to the commencement of the action, Elsie M. Parrish died, and upon petition for substitution, an order was duly entered substituting Augustus R. Parrish, Sr., who is the same person as A. R. Parrish, executor of the estate of Elsie M. Parrish, deceased, as a party defendant, for and in the place of Elsie M. Parrish.

The amended complaint upon which plaintiff went to trial contains two purported causes of action. In paragraph No. 3 of the first cause of action, it is alleged in substance that on December 10, 1946, for a valuable consideration, defendant W. Shepherd, acting for and on behalf of the marital community composed of himself and wife, and as the duly authorized and acting agent of defendants A. R. Parrish and wife and the marital community of them composed, made, executed and delivered to plaintiff their promissory note in the sum of $498.20, payable in twelve monthly installments of not less than $41.52 each, the first payment to be made on Janaury 10, 1947, and a like payment on the tenth of each month thereafter. A true copy of the note is then set out in the complaint. It is further alleged that demand has been made upon defendants for payment of the promissory note and interest, and that defendants have failed, neglected and refused to pay all or any part thereof. It is further alleged that the note provides for a reasonable attorney's fee, and that the sum of one hundred fifty dollars is a fair and reasonable attorney's fee to be allowed plaintiff.

It is alleged in the second cause of action that on November 29, 1946, for a valuable consideration, defendant W. Shepherd, acting for and on behalf of the marital community composed of himself and wife, and as a duly authorized and acting agent for the defendants A. R. Parrish and wife and the marital community of them composed, made, executed and delivered to plaintiff their promissory note in the sum of seven hundred dollars, payable in twelve monthly installments of not less than $58.34, the first payment to be made on December 10, 1946, and a like payment on the tenth day of each month thereafter until the whole sum should be paid. True copy of the note is then set out in the pleadings. It is further alleged in this cause of action that plaintiff has made demand upon defendants for the payment of the promissory note and interest, and that defendants have failed, refused, and neglected to pay any part or all thereof.

Defendant A. R. Parrish, individually and as the duly appointed, qualified and acting executor of the last will and testament of Elsie M. Parrish, deceased, answered the amended complaint, and in so far as here material, stated that he did not make either of the promissory notes set out and referred to in the amended complaint, either on behalf of himself or the community, nor did he or the community composed of himself and Elsie M. Parrish, now deceased, authorize W. Shepherd or any other person to make, execute, and deliver the notes or either of them in his behalf or in behalf of either A. R. Parrish and wife or the community, and that the notes are not the notes of A. R. Parrish or Elsie M. Parrish, and are not the notes of the community composed of A. R. Parrish and Elsie M. Parrish, now deceased, and that neither A. R. Parrish nor Elsie M. Parrish ever consented to, authorized or ratified the making of the notes. This defendant denied that he or the community aforesaid agreed to pay a reasonable sum as attorney's fees in the event action was instituted on the notes, or any other sum.

We do not find in the record any answer by W. Shepherd, although Shepherd and wife demurred to the complaint,

which demurrer was overruled. However, it appears from the statement of facts that defendant Shepherd was represented in the trial of the action and participated in the examination of witnesses, and the findings recite the appearance of the Shepherds in person and by counsel.

The matter came on for hearing before the court on April 28, 1948, and thereafter, on June 1st, the court made and entered findings of fact, conclusions of law and judgment, favorable to plaintiff. The judgment was against A. R. Parrish, individually and as executor of the estate of Elsie M. Parrish, deceased, for the amounts prayed for in the amended complaint. By the judgment, defendants W. Shepherd and wife were dismissed as defendants from the action. Defendant Parrish, individually and as executor of the last will and testament of Elsie M. Parrish, has appealed from the judgment entered, and makes nine assignments of error.

Both of the notes referred to in the complaint were signed "A. R. Parrish, by W. Shepherd." It is apparent from the pleadings and the contentions made herein, that the ultimate question to be decided is whether or not W. Shepherd was authorized to sign the notes as the agent of A. R. Parrish and wife.

The trial court found that each of the notes referred to in the amended complaint was made, executed, and delivered to respondent Sharpe Sign Company by W. Shepherd, acting as the duly authorized agent of A. R. Parrish and Elsie M. Parrish, his wife, and the marital community of them composed. The trial court further found that, prior to the commencement of this action, demand was made upon A. R. Parrish and wife for the payment of the notes and interest, but that they had failed, neglected, and refused to pay all or any part thereof. The court further found that one hundred fifty dollars attorney's fee was a reasonable amount to be allowed respondent on its first cause of action, and two hundred dollars on its second cause of action.

While we are of the opinion that the findings of the trial court have ample support in the record, in view of some of the questions raised by appellant, which we shall discuss,

we deem it desirable to refer to portions of the testimony which the trial court undoubtedly accepted as the basis for the findings, conclusions, and judgment entered herein.

It appears from the testimony of A. D. Browning that respondent, Sharpe Sign Company, is a Washington corporation, engaged in the Neon and general sign business in the city of Tacoma. This company has been in business since 1907. It was incorporated in 1945, since which time Mr. Browning has been president of the corporation. Appellant, A. R. Parrish, has for many years been a practicing dentist in the city of Tacoma, and at the time of the controversy with which we are here concerned was operating an advertising dental office at 914½ Broadway. The building in which Dr. Parrish had his office was partially owned by W. W. Keyes, an attorney of Tacoma, who managed the building. Mr. Browning and appellant had known each other for many years, and appellant had been a customer of the Sharpe Sign Company during this time.

While in view of the testimony of both Mr. Browning and Mr. Shepherd we do not think it material, other than to establish the background of the relationship between Dr. Parrish and Mr. Shepherd, we desire to refer to an instrument (introduced as defendants' exhibit 7) called "Management Contract," entered into on October 10, 1946, between Dr. Augustus R. Parrish and A. E. Boren and W. Shepherd, the material provisions of which are as follows:

"(1) The term of the employment of the managers was to be from October 10, 1946, to October 10, 1956.

"(2) SERVICES TO BE PERFORMED. Managers shall and do hereby agree to furnish, do and perform for Doctor the following services:

"(a) Furnish one (1) full-time Manager to supervise and oversee the dental office of Doctor in Tacoma, Washington, and carry into effect the other provisions of this agreement and the management policies fixed by the Managers with reference to said office.

"(b) Supervise the hiring of all necessary office help, nurses and assistants required by Doctor in the conduct of said dental office.

"(c) Supervise the conduct of the business office of Doctor and furnish advice and consultation concerning office procedure, bookkeeping arrangements, credits and collections.

"(d) Supervise the purchase of all office supplies, furniture, fixtures and equipment.

"(e) Supervise and handle all advertising and promotion.

"(f) Generally supervise and handle all business details connected with the operation of a dental office, exclusive of the practice of dentistry therein and of the care or treatment of patients therein."

It was further provided that the managers were authorized to improve and modernize the facilities of the doctor's office, the cost not to exceed five thousand dollars, which was to be paid by deducting ten per cent of the gross earnings of the business and applying it upon obligations incurred, such improvements to become the property of the doctor. The managers' compensation was to be seventy-five per cent of the net profits of the doctor's business. For the purpose of guaranteeing the compensation of the managers, the doctor agreed that all fees earned and collections made by the dental office covered by the management contract should be deposited in a bank account, withdrawable only by the signature of the managers. The doctor retained full control over the work of dentistry and the treatment of patients, including the right to hire and discharge dentists employed.

It appears further from the testimony of Mr. Browning that shortly prior to November 4, 1946, Dr. Parrish called Mr. Browning to his dental office, where he introduced Mr. Browning to Mr. Shepherd, at which time Dr. Parrish stated:

"'This man is going to run this business for me, and we want a large sign out in front and will have you talk to Dr. [Mr.] Shepherd and he will tell you more of what his ideas are on it.'"

Mr. Browning stated that, at that time, he told Dr. Parrish that, he, Browning, had dealt with Mr. Keyes on previous occasions in connection with signs on this building, and that, before the company would consider anything very

definitely, they, referring to Dr. Parrish and Mr. Shepherd, should get the permission from Mr. Keyes for such a large sign to be placed on the front of the building.

After getting as much information as possible, the company prepared a preliminary sketch of the proposed sign and submitted it to Dr. Parrish and Mr. Shepherd. Some changes were made, and thereafter a second sketch was prepared by Mr. Browning. This sketch, according to Mr. Browning, was left with Mr. Shepherd. According to this witness, it was the understanding that Dr. Parrish and Mr. Shepherd would obtain the consent and approval of Mr. Keyes for the placing of this sign upon the building. Mr. Browning testified that, shortly thereafter, Mr. Shepherd called him and stated:

" 'We have got the okeh from Keyes; come on down; we have got to get going on this job.' "

Mr. Browning's testimony continues:

"Q. Did he show you anything on that sketch to indicate Mr. Keyes' approval? A. 'O.K.' down here on the corner. Q. What does it say? A. 'O.K.' on the corner, 'W.W.K.' "

The sketch upon which the above O. K. was noted was introduced as plaintiff's exhibit No. 1.

On cross-examination by Mr. Heiman, attorney for the Shepherds, Mr. Browning testified that he discussed with Dr. Parrish and Mr. Shepherd the matter of how the sign was to be paid for, that Dr. Parrish participated in the conversation, and that the conclusion reached was that the Neon sign should be purchased on a conditional sales contract and a term note; that, while nothing particular was said further about the execution of the note, Mr. Browning was informed that he was to conclude the deal with Mr. Shepherd; that he recognized Dr. Parrish as the principal throughout the entire transaction.

Mr. Shepherd corroborated the testimony of Mr. Browning, and stated more in detail the discussions which he and Dr. Parrish had relative to the Neon sign and the changing of the lettering on the doors and windows. He stated that they had discussed these matters between themselves before Mr. Browning was called to Dr. Parrish's office. Ac-

cording to Mr. Shepherd, after he and Mr. Boren had taken over the business management of the office, which they did immediately after the execution of the management contract, they decided it should be modernized, and in order to do this, a new sign should be put up and new lettering placed on the doors and windows. It was understood that these improvements were to be included in the five thousand dollars set aside for improvements. This witness further stated that Dr. Parrish seemed to be well satisfied with the Neon sign after he had seen a sketch of it, and to be satisfied with the terms in paying for it; that Dr. Parrish was aware of the cost of these improvements, as they had been discussed between the doctor and himself in the absence of Mr. Browning, and that Dr. Parrish made no objections either to the price or the terms.

"Q. In other words, is the price of these improvements and the terms the same price and terms that you discussed with Dr. Parrish? A. Yes, they are."

This witness further stated that his instructions and understanding were that he had full authorization to go ahead with the sign and the lettering. He further stated that Dr. Parrish was present in the office at the time the notes in question were signed by him.

"Q. Were there copies or duplicate originals of these instruments left with you by Mr. Browning? A. Yes. Q. Did those come to the attention, so far as you know, of Dr. Parrish? A. Yes, I believe we discussed them after Mr. Browning left. The copies were left in the office. Q. I believe it was indicated this morning that Dr. Parrish left for California about that time. Was it after these notes and contracts had been signed? A. Yes, Dr. Parrish and I both went to California about the same day and we both left after the contracts and notes were signed."

The contracts referred to were introduced as plaintiff's exhibits Nos. 3 and 5, exhibit No. 3 being a conditional sales contract entered into November 27, 1946, between Sharpe Sign Company and A. R. Parrish by W. Shepherd. This is a conditional sales contract executed in connection with the seven-hundred dollar promissory note which forms the

basis of respondent's second cause of action, and is for the Neon sign. The other contract, exhibit No. 5, was between the same parties and covered the cost of proposed gold leaf lettering to be placed on the doors and windows of Dr. Parrish's office, and was executed in connection with the $498.20 note.

Mr. Shepherd further stated that the terms as expressed in the contracts and notes were terms discussed between the witness and Dr. Parrish.

Mr. Keyes testified in substance that he had a conversation with Mr. Shepherd and Dr. Parrish about placing the large Neon sign on the building; that Mr. Browning was not present at this conversation. The witness stated that Mr. Shepherd and the doctor came in and said something to the effect that they "were making a deal" or "were going to make a deal"; that they had a picture of a sign which they wanted the witness to approve. Mr. Keyes told them that he would approve it all right, but that he thought the rent ought to be increased if they were going to put up a sign on the outside. This increase of rent, according to Mr. Keyes, was to be approximately fifty dollars a month. The witness was then handed plaintiff's exhibit No. 1, which is a drawing of the proposed Neon sign, and he stated that his initials placed thereon indicated his approval of the sign. The witness further stated that neither Dr. Parrish nor Mr. Shepherd expressed any objection to an increase in the rent; that in accordance with this conversation, he, Mr. Keyes, prepared a new lease, which he submitted to Dr. Parrish, and that was the last he ever heard of the matter.

There is conflict in the testimony as to when Dr. Parrish left for California, the doctor contending he went about the 29th or 30th of November, while Mr. Shepherd testified that he left about the 15th of December, after the notes and contracts hereinbefore referred to had been signed.

After the signing of the instruments above referred to, the Sharpe Sign Company began working on the Neon sign, and also on the lettering on the doors and windows in Dr. Parrish's office. So far as respondent sign company is con-

cerned, it does not appear that it heard anything further from Dr. Parrish until after his return from California, at which time according to Mr. Reisinger, vice-president of the sign company, Dr. Parrish called the company on the telephone. We quote from Mr. Reisinger's testimony relative to the conversation he had with Dr. Parrish:

"Q. Was it by telephone or personal? A. On the telephone. He called and was a little surprised why the large sign had not been erected on the building, and I told him the reason that it was not, that we had gone with the construction of the sign as far as possible and had ceased further work on it due to the fact that Mr. Shepherd had not given us the last details in regard to the color of the tubing on a certain portion of the sign and therefore the work had ceased. Dr. Parrish at the time was quite surprised and he said for me to have Mr. Browning get in touch with him at his home but to give no information to the office that he was in town at that time."

Appellant, according to his statement, returned from California about February 5, 1947. About March 1st, appellant called Mr. Browning and ordered all work stopped, giving as his only reason, according to Mr. Browning, that Mr. Keyes wanted more rent and that Mr. Shepherd should not have ordered the sign. At this time the window and door lettering was practically completed, while the Neon sign was three-fourths finished. As the result of appellant's order to stop the work, respondent did nothing further.

Plaintiff's exhibit No. 3, which is the conditional sales contract for the Neon sign, recites that a down payment of $369.90 was received. It was not contended that this amount was in fact ever paid by the doctor or ever received by respondent, and so, while the agreed purchase price of the sign was to be one thousand dollars, plus sales tax and carrying charges, all that respondent is claiming in this action is seven hundred dollars, which it contends is a reasonable amount to be paid for the work done and material furnished in the preparation of the sign.

It also appears from the conditional sales contract for the gold lettering on the doors and windows of the doctor's

office that the price to be paid for such work and material was to be six hundred seventy-six dollars, plus sales tax and carrying charges, of which the sum of $226.28 was to be paid upon the execution of the agreement. It is also admitted that the sum of $226.28 was not paid at the time the contract was signed, but was paid by Dr. Parrish by check after his return from California, and this was the only amount he ever paid on either of the notes or contracts hereinbefore referred to.

It may be stated here that appellant denied contacting Mr. Browning to discuss new signs; he denied giving authority to Shepherd to do anything about the signs; he denied that he ever approved the door and window lettering or the new Neon sign covered by the contracts here involved; he denied that he knew of the existence of the notes and contracts, at least until after he came back from California; he denied that he agreed to pay for the signs, or that he intended to pay for them, although he admittedly sent a check for $226 after he came back from California, and this sum is approximately the amount of the down payment stated in the contract for the lettering on the doors and windows.

Respondent contends that the question presented is:

"Was the defendant, Shepherd, held out and represented by appellant to respondent as appellant's agent, authorized to enter into the contracts in question, and to bind appellant for the payment of notes sued upon?"

Appellant contends that no authority to execute promissory notes or contracts was vested in W. Shepherd and Boren under the management contract; that appellant's business was not of such a nature as to require the execution of promissory notes in the operation thereof; that before an agent may obligate his principal on negotiable paper, his authority so to do must either be expressed or so necessary to the accomplishment of the purposes of the agency as to be presumed.

We have no quarrel with the authorities cited to sustain the above principles generally, but respondent did not at the

trial, and does not here, rely upon the management contract to establish the authority of Shepherd to obligate appellant upon the notes in question. It does not appear that Mr. Browning knew of the existence of the management contract when he conferred with appellant and Shepherd in November, 1946. It is apparent that respondent relied entirely upon appellant's acts and statements relative to Mr. Shepherd's authority to complete the deal. In other words, we are satisfied that respondent relied upon the oral representations and statements of appellant, rather than upon the provisions of the management agreement.

There is no question but that the relationship of principal and agent can be created orally. We stated in the early case of *Ankeny v. Young Bros.*, 52 Wash. 235, 242, 100 Pac. 736:

"An agency may be created by written or spoken words or by the conduct of the parties. This is fundamental."

Respondent was not bound by the terms of the management contract, of which he knew nothing. See *Kendall v. Johnson*, 51 Wash. 477, 480, 99 Pac. 310. We quote from the last cited case for the purpose of showing what this court has said relative to the binding effect of a contract such as this management contract upon third parties:

"The first assignment must be be sustained. The appellant was not a party to the contract between the respondent and the firm of Fred Johnson & Co., and never assented to the provisions of that contract. In an action between him and either of the contracting parties he is at liberty to show the true relations subsisting between them, regardless of the relationship which they may have assumed on paper. In other words, it was clearly competent for the appellant to show by oral testimony that the relation of master and servant subsisted between the respondent and the firm of Fred Johnson & Co., and that the respondent had the direction and charge of the blasting which resulted in his injury."

We also call attention to Rem. Rev. Stat., § 3410 [P.P.C. § 757-37], which provides:

"The signature of any party may be made by a duly authorized agent. No particular form of appointment is neces-

sary for this purpose; and the authority of the agent may be established as in other cases of agency."

■ We think there is ample testimony to indicate that Mr. Shepherd did not exceed his authority in executing the notes and contracts hereinbefore referred to.

■ Appellant makes some contention that the notes in question were not signed by both Shepherd and his co-manager, Boren. However, it appears from the testimony of Mr. Shepherd that the parties last named were partners in the enterprise, and, in addition to the fact that in our opinion appellant specifically indicated that Mr. Shepherd was to complete the deal with respondent, we are of the opinion that where a partnership is made an agent, one partner can act for the others. See 2 Am. Jur. 201, § 249; 2 C. J. S. 1346, § 122.

There is a further contention by appellant that respondent stopped work on the doors and windows because it ran out of material. However, there is sufficient testimony to indicate that all of that work was stopped because appellant so ordered.

■ Appellant also makes some contention that respondent's remedy is an action for damages, rather than upon the promissory notes. We do not think the authority cited is controlling here, where the notes were given in consideration of an executory agreement to do certain work and deliver specific articles, and the maker of the notes refuses to accept the goods. 10 C. J. S. 615, 616, § 151; *Moyses v. Bell,* 62 Wash. 534, 540, 541, 114 Pac. 193.

■ We are of the opinion that, under the facts in this case, and in view of the conclusions reached relative to the authority vested in Mr. Shepherd and the fact that at all times respondent was relying upon Dr. Parrish to pay for this work, the court was justified in dismissing Shepherd and wife as parties defendant.

We therefore conclude that the court, under the facts of this case and the law applicable thereto, was entirely justified in finding that respondent was entitled to collect from Dr. Parrish, individually and as executor of the estate

of Elsie M. Parrish, deceased, on the two notes hereinbefore referred to, such notes representing the reasonable value of the work and material furnished in preparation of the Neon sign and the lettering on the doors and windows of the doctor's office, and that it also was entitled to collect the attorney's fee on each note hereinbefore referred to.

The judgment of the trial court must be, and is hereby, affirmed.

BEALS, STEINERT, MALLERY, and HILL, JJ., concur.

[1]Reported in 207 P. (2d) 712.